UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GIL V. PEREZ,

                    Plaintiff,

        - against -

THE CITY OF NEW YORK and
DEPARTMENT OF CITYWIDE
ADMINISTRATIVE SERVICES,

                    Defendants.

**ORDER**

16 Civ. 7050 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Gil Perez claims that Defendants Department of Citywide Administrative Services ("DCAS") and the City of New York discriminated and retaliated against him on the basis of his disability, ethnicity, national origin, and sexual orientation in violation of the Americans with Disabilities Act (the "ADA"), the New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights Law (the "NYCHRL"). Defendants removed the action to this District, and have now moved for summary judgment on all claims (Def. Br. (Dkt. No. 71)), and Perez has moved for summary judgment with respect to his hostile work environment and retaliation claims under the ADA.[1] (Pltf. Notice of Mot. (Dkt. No. 62)) For the reasons set forth below, Defendants' motion will be granted with respect to Plaintiff's

---

[1] As noted above, the Complaint pleads ADA claims for hostile work environment and retaliation. Perez also seeks summary judgment as to certain ADA claims not pled in the Complaint, however, including claims for failure to offer a reasonable accommodation, and discriminatory termination. As discussed in more detail below, because these latter claims are not asserted in the Complaint, they cannot be considered here. See Bal v. Manhattan Democratic Party, No. 16-CV-2416 (PKC), 2018 WL 6528766, at *2 (S.D.N.Y. Dec. 12, 2018), reconsideration denied, 2019 WL 1789586 (S.D.N.Y. Apr. 23, 2019) ("[C]ourts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions at the summary judgment stage.") (internal quotation marks omitted).

ADA claims, and Perez's motion will be denied. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and NYCHRL claims, which will be remanded to Supreme Court of the State of New York, New York County.

## BACKGROUND

I.   **FACTS[2]**

A.   **Perez's Separation from the New York City Housing Authority**

In 1994, Perez – a homosexual Hispanic-American of Cuban national origin who suffers from sleep apnea – started working at the New York City Housing Authority (the "Housing Authority") as a "contract administrator." (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶¶ 2-3, 61) On April 30, 2003, after a disciplinary hearing, the Housing Authority terminated Perez's employment. (Id. ¶ 62)

Later that year, Perez challenged his termination in New York County Supreme Court. (Id. ¶¶ 64-65) On November 18, 2003, the parties entered into a settlement agreement. (Id. ¶ 66) Under the settlement agreement, the Housing Authority rescinded Perez's termination and permitted him to retroactively resign. (Id. ¶ 67) The parties agreed that disciplinary charges brought against Perez and his termination were to be "expunge[d]" from his personnel folder, and the agency's human resources records were to "indicate that Perez resigned, without any

---

[2]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). With respect to the cross-motions, where a non-movant disputes a movant's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-movant's characterization of the evidence for purposes of resolving the motion. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

reference to . . . disciplinary charges . . . or termination." (Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶ 1)

## B.    Perez's Separation from the New York City Department of Sanitation

In March 2009, Perez began working for the New York City Department of Sanitation (the "Sanitation Department") as a mechanical engineer. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 69; Def. Ex. HH (Dkt. No. 69-34) at 2) In a Probation Report dated October 8, 2009, Sanitation Department personnel recommended that Perez's employment be terminated. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 71; Def. Ex. FF (Dkt. No. 69-32)) The 28-page report asserts, among other things, that Perez was unable to perform basic tasks, that he fell asleep on the job, and that he insulted his colleagues (including by calling some of them "disabled"). (Def. Ex. FF (Dkt. No. 69-32)) The report concludes as follows:

> [I]t has become abundantly clear that Mr. Perez does not possess the core competencies needed to fulfill the entry level requirements of a Mechanical Engineer I position. Further, he lacks the desire to apply the training he has received in order to achieve any improvement in his performance. Additionally, Mr. Perez' behavior and treatment of others has caused us to have additional significant concerns. As such, in conjunction with this Probation Report, we are recommending that Mr. Perez be separated from service with the Department of Sanitation.

(Id. at 28-29)

In an October 9, 2009 letter to the Sanitation Department, Perez acknowledged receipt of the Probation Report and requested time to respond to it. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶¶ 72-73; Def. Ex. GG (Dkt. No. 69-33) at 5) In an October 20, 2009 letter, Perez resigned from the Sanitation Department, effective October 19, 2009. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 76) Because of Perez's resignation, the agency's Employee Review Board never acted on the recommendation to terminate Perez. (Id. ¶ 77)

On March 15, 2013, Perez sued the Sanitation Department in New York County

Supreme Court, alleging that he was terminated because of his race, national origin, or perceived

sexual orientation in violation of federal, state, and city law.[3] (Id. ¶ 78; Pltf. Ex. 7 (Dkt. No. 62-

9)) In the Complaint, Perez asserted that he had been constructively discharged:

> Effective October 19, 2009, plaintiff resigned from his employment with
> defendant under threat that his employment would be terminated. He resigned as
> a "probationary employee," knowing he had no job security, wanting to avoid
> having an (unwarranted and unlawful) termination in his employment record. The
> resignation, under threat of termination was a constructive termination.

(Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 79 (emphasis omitted); see also Pltf. Ex. 7 (Dkt. No.

62-9) ¶ 6) Perez settled his action against the Sanitation Department on March 31, 2014.

(Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 80) There is no evidence in the record suggesting

that, as part of the settlement, the Sanitation Department agreed to purge any of its

records concerning Perez's employment. (Def. Ex. KK (Dkt. No. 69-37))

## C.      Perez's DCAS Employment

### 1.      Application, Hiring, and Background Investigation

In February 2013, Perez began employment as a Stationary Engineer with

defendant DCAS. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 4; Perez Aff., Ex. 32 (Dkt. No. 72) at 12

(listing Perez's "Start Date" as "2/10/2013")) Perez's duties and responsibilities included

operating mechanical equipment, such as boilers, air conditioning systems, and fans. (Def. R.

56.1 Stmt. (Dkt. No. 70) ¶ 8)

In connection with his application to DCAS, Perez completed, under oath, a

Comprehensive Personnel Document dated December 12, 2012. (Id. ¶ 5) In completing that

application, Perez answered "No" to the following two questions: (1) "Did you ever resign from

---

[3] Perez's March 15, 2013 lawsuit against the Sanitation Department was filed shortly after he
began employment with DCAS in February 2013.

a job while disciplinary action was pending against you?" and (2) "Have you ever resigned from a job to avoid termination or disciplinary action?" (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 6; Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶ 5; Pltf. Ex. 5 (Dkt. No. 62-7))

DCAS investigator John Boughner conducted a background investigation of Perez. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶¶ 82-83) On April 15, 2013, Boughner contacted Nancy Reilly, the Sanitation Department's human resources director, because PRISE – a New York City electronic database – disclosed that Perez had "'resigned [from the Sanitation Department] under charges.'" (Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶ 7) Boughner asked Reilly to send him "the charge package and any union stipulation that may have settled the case." (Id.) Reilly forwarded Boughner's message to her colleague Matthew Hunter, who informed Boughner that "Perez . . . 'resigned under charges' in consequence of violations of the Department Code of Conduct. . . . [H]e also received an overall rating of Unsatisfactory on his probation report." (Id. ¶ 9; Pltf. Ex. 8 (Dkt. No. 62-10))

On April 16, 2013, Boughner responded as follows to Reilly: "Thank you and your staff for the assistance on Gil Perez. I received the paperwork from Matthew Hunter. In the 11-pages it appears Mr. Perez was not served official charges before his resignation." (Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶¶ 10, 52; see Def. Ex. JJ (Dkt. No. 63-36) (11-page fax from Hunter to Boughner)) In an April 23, 2013 letter to Boughner, Perez states: "I was never served with any charges during or after my employment [with the Sanitation Department], which ended 10-20-2009. Further, to my knowledge, no charges were pending." (Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶ 13; Pltf. Ex. 9 (Dkt. No. 62-11)) At the time, Boughner did not have Perez's October 9, 2009 letter to the Sanitation Department, in which he acknowledges receipt of the Probation Report. (Def. R. 56.1 (Dkt. No. 70) ¶ 74)

On May 6, 2013, DCAS issued a Notice of Personnel Action certifying Perez as "qualified" for the position of Stationary Engineer. (Id. ¶ 7)  Boughner testified that DCAS certified Perez because the Sanitation Department had "not serve[d] a charge packet" on him. (Id. ¶ 8; Boughner Dep. (Dkt. No. 69-31) at 12)  Because no charges had been served, Boughner reasoned that Perez had answered the first question truthfully: "Did you ever resign from a job while disciplinary action was pending against you?"  (Boughner Dep. (Dkt. No. 69-31) at 14-15; Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 88; see also Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶ 12 (Citing handwritten notation stating that the Sanitation Department "verified candidate resigned under charges.  However, no charges were served."))

There is no evidence that Boughner addressed the truthfulness of Perez's answer to the second question ("Have you ever resigned from a job to avoid termination or disciplinary action?") during the 2013 background investigation.  For example, Boughner never asked Reilly or Hunter whether Perez had resigned in lieu of termination.  (Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶¶ 7, 10 (noting Boughner's request to Reilly for the "charge package" and Boughner's belief that "Mr. Perez was not served official charges before his resignation"))  However, the documents that Hunter sent to Boughner include a two-page Sanitation Department memorandum stating that Perez had been informed on October 8, 2009 – twelve days before he submitted his resignation letter – that the Probation Report recommended his termination.  (Def. Ex. JJ (Dkt. No. 63-36))

In conducting his investigation of Perez in 2013, Boughner never learned about the circumstances of Perez's separation from the Housing Authority and the subsequent lawsuit that permitted him to resign in lieu of termination.  (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 68)

## 2. Discipline and Transfers at DCAS Between September 2014 and October 2015

Between September 2014 and October 2015, Perez was issued numerous

disciplinary letters for insubordination and poor performance, and his shifts and assigned

worksites were repeatedly changed. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶¶ 20, 22, 24, 27, 37; Def.

Ex. M (Dkt. No. 69-13)) Defendants maintain that DCAS transferred Perez because of

complaints about his performance and attitude. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶¶ 22-23, 37)

Perez contends that the transfers were the product of unlawful discrimination.

As of September 2014, Perez reported to Senior Stationary Engineer Ricardo

Carone at 2 Lafayette Street in Manhattan. (Def. Ex. M (69-13) at 2) In a September 2, 2014

disciplinary memorandum, Carone states that on August 21, 2014, Perez was "rude" and

"expressed no interest" in helping to resolve a water leak reported by a tenant. (Id.) According

to Carone, "this type of problem should have been easy to determine and assess" and it fell

"within [Perez's] job description." (Id.) "[Perez's] failure to assess the problem and implement

corrective measures, in addition to [his] unprofessional interaction with a client," resulted in the

issuance of the disciplinary memorandum. (Id. at 3)

In a November 17, 2014 disciplinary memorandum, Carone states that Perez did

not obey his instruction to install certain boiler equipment and then refused to answer Carone's

questions about why he had not installed this equipment. (Id. at 4-6) Carone's memorandum

reads as follows:

> On 11/12/14 at approximately 2:30 pm, I delivered two Fire Eye Sensor Controls
> to Gil Perez. I instructed Mr. Perez to install one Fire Eye Sensor Control for
> boiler #2 and to store the second sensor control on the shelf for future use. I
> placed both controls on the table directly in front of Mr. Perez. When I returned,
> 2 1/2 hours later . . . both controls were still on the table where I had placed them.
> Mr. Perez was in the room typing on his personal laptop. Plugged into his laptop
> was an external printer which was plugged into the electrical outlet in the room.

Obviously, Mr. Perez was performing personal work during work hours which is not permissible. I asked him if he had installed the controls to which he answered that he had not. . . . The following day, 11/13/14, at 7:30 am I noticed that the Fire Eye Sensor Control was not installed nor was the second control put away. Both units were still on the table where I had placed them the day before. Mr. Perez failed to follow a direct order to install the sensor.

On the morning of 11/14/14 . . . I asked . . . whether during his rounds last night he shut off the lights of any unoccupied rooms and areas throughout the building as he had been instructed to on 11/03/14 (for energy conservation purposes.) He responded that he was able to shut off some of the lights but not all them. . . . I asked him was why he was unable to complete this task. I did not receive a response. I repeated my question; Mr. Perez responded by saying my name out loud over the phone, (Richie) and then hung up the phone on me. Immediately after I went to 2 Lafayette Street. I asked him if he had hung up the phone on me or whether communication was lost. He did not respond. I repeated the question; again he did not respond. I then asked if he understood my question and repeated the question. He again failed to respond. Mr. Perez's failure to respond to me, his direct supervisor, is insubordination.

I then asked him if he had installed the fire eye sensor control; he did not respond. I then explained that I needed an answer about the controls. He replied that an entry was placed in the Log Book and that I would need to read the Log Book for an answer to my question. I replied that he needed to respond to my question. . . . Instead, Mr. Perez stared at me blankly. . . .

While at 2 Lafayette Street I went to read the Log Book. In the Log Book entry for November 13, 2014, Mr. Perez wrote that he had "began to install Fire Eye on #2 boiler and need wiring diagram. Notified Chief." . . . Obviously, he had never contacted me on 11/13/14, and in fact, he didn't answer me when I had asked him about the fire eye sensor control installation the morning of 11/14/14. His entry about contacting me is False. . . .

Mr. Perez is disrespectful. He does not take any initiative with respect to the work in the mechanical plant, as his title requires. . . .

(Id. at 4-6) Perez was presented with a copy of this disciplinary memorandum but refused to

sign for it. (Id. at 6)

In about September 2014, DCAS's Director of Discipline Eric Hicks – who

advises supervisors on disciplinary matters – began discussing Perez's "misconduct and

incompetence" with DCAS Deputy Commissioner for Administration Shameka Boyer Overton.

(Boyer Overton Decl. (Dkt. No. 75-1) ¶¶ 7, 9)  Hicks had received complaints from multiple supervisors about Perez's "performance" and inability to complete "basic station engineering" tasks, and in "late 2014, early 2015" he began investigating these complaints about Perez's work performance.  (Hicks Dep. (Dkt. No. 62-33) at 6)

In about April 2015, Perez was transferred to the New York State courthouse at 60 Centre Street, where he reported to Senior Stationary Engineer Daniel Maloney.  (Perez Aff. (Dkt. No. 72) ¶ 23)  In a May 12, 2015 disciplinary memorandum, Maloney complains that Perez failed to respond to tenant calls the previous day, even though sixteen voicemails had been left for him.  (Def. Ex. M (Dkt. No. 69-13) at 7)  In a May 12, 2015 disciplinary memorandum, Maloney states that Perez refused to turn on lights in his work area, despite being warned that this presented a safety issue:

> As I have informed you part of your duties as the Engineer when entering the work area is to turn the lights on.  You responded to me 2 weeks ago that "you don't turn lights on and off".  . . .  I informed you of this and told you this was not only part of your job but a safety concern.  By not performing this task you are not only neglect[ing] your duties but have made the work area . . . less safe not only for yourself but for the subordinates for whom you are responsible.

(Id. at 8)

In a May 13, 2015 disciplinary memorandum, Maloney complains that Perez refused to respond to a tenant call because of a concern that – if he responded to the call – he would not be able to clock out on time:

> May 12th at approximately 1:05 PM I instructed you to respond to a house call in room 212 here at 60 Centre Street.  You refused stating that "you did not have sufficient time to answer the call and sign out at 2 PM".  There was plenty of time to go [assess] the situation and report back.  Your refusal to answer the call after being told directly by me to do so is insubordinate.

(Id. at 9)

In a May 29, 2015 email to DCAS's Executive Director of Mechanical Operations Edward O'Donnell, Maloney complains about Perez's poor attitude and refusal to work:

> The situation with Gil Perez, is quickly becoming unworkable. . . .
>
> . . . He rarely resolves anything, rarely picks up the phone and as far as house calls go he does record them in the log book but only actually goes to 1 or 2 or 3 a day and most require follow up by others. He is disrespectful to me in front of the other staff members and today in front of two staff members accused me of calling him a liar. . . . I repeatedly have to explain how to operate the equipment and he always says I never showed him.
>
> Given the amount of equipment in this building and that we are understaffed I don't see how I can get the job done with this individual.

(Id. at 10-11)

In a June 1, 2015 email to O'Donnell, Maloney again complains about Perez, stating, inter alia, that Perez had turned off a building's chiller (despite being told to leave it on) and that Perez's whereabouts were unknown for two hours. (Id. at 12)

In a June 11, 2015 disciplinary memorandum, Maloney states that Perez refused to answer Maloney's question about his movements:

> On Tuesday June 9th while returning to 60 Centre I encountered you coming out New York, NY 10007 of the Pearl Street entrance with a hand truck. When I asked you where you were going you did not respond[.] [Y]ou simply pointed toward Centre Street. Not responding to a direct question from your supervisor is insubordinate.

(Id. at 14; see also id. at 12 (Maloney's June 1, 2015 email to O'Donnell about this incident, and O'Donnell's response that Perez "does not appear to be improving"))

On June 11, 2015, Maloney issued three disciplinary letters regarding Perez. The letters addressed a series of incidents that had occurred over the previous two weeks. (Id. at 14-17)

On June 1, 2015, Perez had injured himself as a result of his refusal to turn on the lights:

> On Monday June 1 you said you injured yourself tripping in the unlit hallway between the boiler room entrance and the rotunda area in the sub basement. I have told you in person and in writing that you should turn the lights on before entering an area. . . . [Y]ou are not only behaving unsafely but disregarding my direct instructions, which is insubordinate.

(Id. at 15)

On May 28, 2015, Perez was not able to adjust a thermostat:

> On Thursday May 28th I sent you on a call to room 119. I explained that they were warm and asked you to adjust the thermostat. A while later you returned to the chiller room and asked me which way to turn the thermostat to make it colder. As a Stationary Engineer you are required to operate, maintain and adjust air conditioning equipment. Adjusting a thermostat is a simple task of which you should be capable.
>
> However the fact that you were asking how to adjust the Barbara Coleman thermostat which controls only the steam radiators instead of the distinctly different Johnson Controls thermostat which I had told you controls the HVAC shows you are putting no effort into understanding the equipment in this building.

(Id. at 16)

On May 28, 2015, Perez "failed to take readings on the chiller," even though Maloney had "explained to [him] the importance of taking the readings." (Id. at 17)

In a June 12, 2015 disciplinary memorandum, Maloney states that Perez failed to diagnose a simple cooling problem, which Maloney resolved in 10 minutes:

> Yesterday I sent you on a house call to room 422; the complaint was "no ac." When I later asked you if you had resolved the issue you replied that the unit was on but you didn't know why it wasn't getting cool in the room.
>
> When a second call came in from the same room about an hour and a half later I responded. The conditions were no ac in either the robing room or the courtroom. The problem in the robing room was the belt on the supply fan was broken and in the courtroom the thermostat was not functioning. I diagnosed these two problems and provided cool air to the courtroom in less than ten minutes. As a

Stationary Engineer you should have been able to easily and quickly identify
these problems, as I did.

(Id. at 18)

On June 9, 2009, Director of Discipline Hicks asked O'Donnell to confirm that

Perez had received disciplinary letters concerning his job performance. (Perez Aff. (Dkt. No. 72)

at 96) O'Donnell responded by saying that "all letters were emailed to Mr. Perez." (Id.) "We

need to make sure he received them," Hicks said. "They will not count as prior disciplinary

action unless we can prove he received them." (Id.)

In a June 25, 2015 disciplinary memorandum to Perez, O'Donnell recounts

several performance issues that Maloney had documented over the past several weeks. (Id. at

19-20) O'Donnell warns Perez that continued misconduct will result in disciplinary action:

> The aforementioned conduct will not be tolerated by the agency. Your past
> actions displayed a lack of judgment and an inability to perform the basic
> functions of your job. You received an updated Tasks and Standards on June 1,
> 2015 to ensure that you are aware of your duties. If anything is unclear or you
> need any additional training in performing your duties, you need to notify me as
> soon as possible. If you do not contact me, I will assume that you understand
> what is required of a Stationary Engineer.
>
> This letter is a warning, and it will be placed in your personnel folder. You are
> allowed to respond to it. Any response you submit will also be placed in your
> personnel folder.
>
> A repeat of the abovementioned behavior or any misconduct will result in
> disciplinary action. If you have any questions or concerns, I am more than willing
> to discuss them with you.

(Id. at 20 (emphasis omitted)) When presented with this disciplinary memorandum, Perez

refused to sign for it. (Id.)[4]

---

[4] Perez asserts that disciplinary letters issued to him in or about June 2015 were "a way to
terminate [him] without any form of due process." (Perez Aff. (Dkt. No. 72) ¶¶ 54-58)

On June 22, 2015, Perez was transferred, and he began reporting to Senior Stationary Engineer Frank Salzillo. Perez's work sites were 18 Richmond Terrace and 130 Stuyvesant Place in Staten Island. (Perez Aff., Ex. 32 (Dkt. No. 72) at 91) On June 26, 2015, Salzillo issued the following disciplinary memorandum:

> On Tuesday June 23, 2015 I asked you to check an A/C unit at 18 Richmond Terrace. I asked you to put refrigerant gauges on the unit to determine if it was low on refrigerant and you never did. This is a failure to perform your duties.
>
> On Tuesday June 23, 2015 I asked Ed Mallien to ask you to inventory the fuses in the storage room and make a list of each size and how many we have. Later you informed me that I should contact you directly with any requests. . . . Ed Mallien my day engineer can and will be passing messages on to you and I expect you to respond accordingly. I expect Ed Mallien to do the same if I ask you to give a message to him.
>
> On Thursday June 25, 2015 I asked you to check a fan coil unit in room 811. You informed me that you would gladly go when I give you a key. I explained to you that this is a secure area of the District Attorney's Office and there is a N.Y.P.D. Officer on the 7th Fl. 24 hours a day, 7 days a week, that would let you into any area that requires your access. Again I gave you a direct order to go check this unit and you refused. The next time you refuse a direct order I will refer you for disciplinary action.
>
> **This letter is a <u>warning</u>, and it will be placed in your personnel folder. You are allowed to respond to it. Any response you submit will also be placed in your personnel folder.**
>
> **A repeat of the abovementioned behavior or any misconduct will result in disciplinary action.** If you have any questions or concerns, I am more than willing to discuss them with you.

(Def. Ex. M (Dkt. No. 69-13) at 21-22 (emphasis in original)) Perez was presented with a copy of this document but refused to sign for it. (Id. at 22)

In a September 16, 2015 email to Salzillo, Staten Island Borough Supervisor Yuen Lee reports three other acts of misconduct by Perez. First, Perez had been "sarcastic and disrespectful" toward Commissioner of Buildings Frank Marchiano when checking the radiator in his office. (Id. at 30) Second, when a security guard at 130 Stuyvesant Place asked Perez to

lower the air conditioning, he replied, "If I don't get a parking spot here . . . , I'm not lowering the air conditioning." (Id. at 31) And on September 9, 2019, Perez's conduct was "so disturbing that it prompted" a city council member's chief of staff to ask Perez to leave the premises, which he initially refused to do. (Id. at 29) The council member reported to Lee that Perez "was very rude, had a bad attitude and a nasty mouth." (Id. at 30)

On September 24, 2015, Salzillo directed Perez to no longer report to a floor at 130 Stuyvesant Place occupied by the Richmond County District Attorney's Office due to complaints about him from the District Attorney's Office Director of Facilities Management and Security. (Id. at 32; Boyer Overton Decl. (Dkt. No. 75-1) ¶ 12) Salzillo presented Perez with a copy of the directive banning him from this area of the building, but Perez refused to sign for it. (Def. Ex. M (Dkt. No. 69-13) at 32)

In an October 13, 2015 disciplinary memorandum, Salzillo notes that on October 9, 2015, Perez had waited hours before acting on a request to turn on air conditioning, and had only did so after Salzillo instructed him on how to complete the task:

> On Friday October 9, 2015[,] I received a call from Mr. Lee . . . at 3:10 PM, informing me that 130 Stuyvesant Place was very warm and needed the A/C turned on. He said he called your phone in the engineer's office and left a message that the building was warm at about 11:45. I called you (Gill Perez) and asked you to put the A/C on. You told me that you did not feel comfortable putting the A/C on, that in the 4 months that you have been there[,] you have never put the A/C on. You asked me if I could send another Engineer there to put it on. After coaching you on how to put the A/C on you finally did.
>
> When you were hired[,] you were given a Task and Standards Form to read and sign. Task # 3 states (Operates, Maintains, and [A]djusts Air Conditioning equipment) When the tenants in the building [s]tarted calling or when you noticed the building was warm[,] you should have acted on your own and started the equipment.

(Id. at 35) Salzillo presented Perez with a copy of the memorandum, but he refused to sign for it.

(Id.)

On October 7, 2015, Perez was directed to appear on October 20, 2015, at the Office of Disciplinary Proceedings at 1 Centre Street in Manhattan. (Def. Ex. M (Dkt. No. 69-13) at 33) Salzillo presented Perez with a notice to appear, but he refused to sign for it. (Id.) As discussed below, although disciplinary charges were drafted against Perez, DCAS Deputy Commissioner Shamika Ovington informed Director of Discipline Hicks that it might not be necessary to pursue the disciplinary charges against Perez, because he might be "disqualified."[5] (Hicks Dep. (Dkt. No. 62-33) at 11)

On October 8, 2015, Perez was advised that, effective October 11, 2015, he would be transferred to another City-owned building in Staten Island. (Def. Ex. I (Dkt. No. 69-9) at 2; Boyer Overton Decl. (Dkt. No. 75-1) ¶ 12)

On October 16, 2015, Assistant Director of Facility Operations Daniel Donovan informed Perez that he had received a complaint that 130 Stuyvesant was "extremely hot." (Def. Ex. M (Dkt. No. 69-13) at 39) Perez told Donovan that he was having "an extremely stressful day" given the number of temperature complaints that he had received. (Id.) Donovan asked Perez "why he did not turn on the absorption system to cool the building." (Id.) Perez said that "the chillers were turned off several days ago," and he did not know how to turn them on. (Id.) Donovan responded, "You are telling me that as a two ticket stationary engineer you need to be shown how to turn on a chiller? You did not turn on the chiller so you neglected your duties." (Id.)

---

[5] New York State Civil Service Law § 50(4) provides that employees with civil service protections may be disqualified from their appointment "upon a finding of illegality, irregularity or fraud of a substantial nature in [their] application." N.Y. Civ. Serv. § 50(4)(h).

### 3. **Alleged Discriminatory Remarks and Conduct**

According to Perez, DCAS supervisors discriminated against him on account of his ethnicity and sexual orientation by repeatedly issuing disciplinary letters to him, and by changing his shifts and work location. (Perez Dep. (Dkt. No. 69-2) at 12-13; Pltf. Counter R. 56.1 Stmt. (Dkt. No. 74) ¶ 24) In support of these allegations, Perez asserts that Carone and Maloney once called him a "dumb Hispanic." (Pltf. Counter R. 56.1 Stmt. (Dkt. No. 74) ¶ 15) Perez also asserts that on December 10, 2014, Maloney directed him to "stand near a live steam hose that was caused to burst. It burned [him] and as it burned [him, Maloney] said that was for . . . Carone." (Id. ¶ 14; Perez Aff. (Dkt. No. 72) ¶ 40) Perez claims that Maloney targeted him because of his ethnicity and sexual orientation. (Pltf. Counter R. 56.1 Stmt. (Dkt. No. 74) ¶¶ 14, 16)

As evidence of sexual orientation discrimination, Perez claims that Carone once wrote "derogatory and diminutive" emails about him that "refer[red] to [his] sexual preference" and accused him of ""acting up."" (Id. ¶ 17) Perez also notes that he and a gay colleague (who started work at DCAS on the same day) were transferred more than their colleagues. (Perez Aff. (Dkt. No. 72) ¶¶ 9, 13) Like Perez, the gay colleague faced disciplinary charges and termination. (Id. at 8 ¶ IV) Perez also claims that a black co-worker was subjected to multiple transfers and a demotion. (Id. ¶¶ 7, 9-10, 12, 51; Pltf. Counter R. 56.1 Stmt. (Dkt. No. 74) ¶ 5)

### 4. **Reasonable Accommodation Request**

In an October 15, 2015 letter – submitted one week after he was notified of a shift change – Perez asked DCAS to give him six weeks' notice before any future shift changes on account of his sleep apnea. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 20) Perez's letter states:

> I was advised that I would be transferring to a different location with different
> work hours. . . . The advice of transfer was the third in 8 months, without writing,

> with less than 48 hours notice and to a different shift (time). . . . I believe six
> weeks advance notice of future transfers would be reasonable. . . .

(Def. Ex. I (Dkt. No. 69-9)) Perez included the following note from a physician's assistant:

> Mr. Gil Perez suffers from Sleep Apnea. He has had several changes made to his
> work shift over the past few months. The constant change is having a deleterious
> affect on his sleep cycle and is aggravating his Sleep Apnea. He would benefit
> most from no further shift changes. Thank you for your help.

(Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶ 22; Pltf. Ex. 14 (Dkt. No. 62-16) at 3) On November 8,

2015, Perez submitted a Reasonable Accommodation Request form, supplementing his request.

(Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 26)[6]

DCAS's Diversity and Equal Employment Opportunity Officer Belinda French

was initially assigned to address Perez's reasonable accommodation request. (Def. R. 56.1 Stmt.

(Dkt. No. 70) ¶¶ 31, 44) However, French was then responsible investigating an equal

employment opportunity ("EEO") complaint filed against Perez. (Id. ¶ 40) Accordingly, in

November 2015, Danielle Barrett – DCAS's Executive Director for Training and Diversity

Management – assumed responsibility for addressing Perez's reasonable accommodation

request. (Id. ¶¶ 31, 41-43) Barrett spoke with Perez multiple times, requested follow-up medical

information, and discussed Perez's responsibilities with his supervisors (Salzillo and possibly

O'Donnell). (Id. ¶¶ 46-56; Def. Ex. N (Dkt. No. 69-14); Barrett Dep. (Dkt. No. 69-22) at 9-10)

Perez's doctor submitted a letter on March 16, 2016, and Perez submitted a supplemental letter

on March 31, 2016. (Def. Ex. N (Dkt. No. 69-14))

---

[6] Contrary to Perez's argument, DCAS did not change Perez's shift or work location during the
pendency of his reasonable accommodation request. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 30)
Perez argues that his shift changed at one point (Pltf. Opp. (Dkt. No. 73) at 8), but the November
24, 2015 email that he cites for this proposition shows only that his supervisor (Salzillo) planned
to change his shift for two days in early December. (Pltf. Ex. 19 (Dkt. No. 62-21)) There is no
evidence that Perez worked those shifts. In his affidavit opposing Defendants' motion for
summary judgment, Perez makes no reference to any shift change after October 15, 2015. (Perez
Aff. (Dkt. No. 72))

On April 26, 2016, Barrett issued a decision granting Perez's reasonable accommodation request to the extent that Perez would be "afforded no less than two (2) weeks written notice of any shift change, excluding requests for overtime." (Id.)

Defendants contend that Perez's request for six weeks' notice of any shift change was not reasonable. They note that Perez was responsible for "maintain[ing] cooling systems," and that six weeks "constitutes approximately half the cooling season." (O'Donnell Aff. (Dkt. No. 69-10) ¶¶ 15-16) Moreover, retirements and resignations – which create vacancies that necessitate shift changes – "are rarely provided with (6) weeks' notice." (Id. ¶¶ 18-19) O'Donnell asserts that six weeks' notice of any shift change would have been "unreasonable given the operational needs of the Mechanical Operations Division and the responsibilities of a stationary engineer." (Id. ¶ 20) Defendants further note that during Perez's employment with DCAS, three days' notice for shift and work location changes was standard for Stationary Engineers. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 21)

### 5. Perez's Decertification and Termination

In November 2015, Director of Discipline Hicks informed Deputy Commissioner Boyer Overton that Perez's "electronic employment record reflected that in 2009 [he] had resigned from his position at the Department of Sanitation while under disciplinary charges," and that Perez had not disclosed this information on his Comprehensive Personnel Document. (Boyer Overton Decl. (Dkt. No. 75-1) ¶ 14) In late November 2015, Boyer Overton shared this information with DCAS's Deputy General Counsel Sanford Cohen and asked whether Perez could be "decertified" on this basis. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶¶ 92-93) Boyer Overton was not aware of Perez's reasonable accommodation request. (Boyer Overton Decl. (Dkt. No.

75-1) ¶¶ 21-23)  Cohen suggested that Boyer Overton collect all information concerning Perez's separation from the Sanitation Department.  (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 94)

DCAS's files contain an unsigned draft document dated November 20, 2015, entitled "Notice of Informal Conference [–] Charges and Specifications," with a December 3, 2015 disciplinary hearing date for Perez.  (Pltf. Ex. 17 (Dkt. No. 62-19; Pltf. R. 56.1 Stmt. (Dkt. No. 62-17) ¶ 34)  DCAS's files also contain an unsigned draft document dated December 20, 2015, entitled "Statement of Charges."  (Pltf. Ex. 18 (Dkt. No. 62-20; Pltf. R. 56.1 Stmt. (Dkt. No. 62-17) ¶ 35)  Hicks testified that disciplinary charges were not served on Perez because Hicks learned that he "was going to possibly be disqualified."[7]  (Hicks Dep. (Dkt. No. 62-33) at 11, 14; see also Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶¶ 37-38)

In December 2015, Boyer Overton received 34 pages of documents from the Sanitation Department concerning Perez, which she provided to Cohen.  (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶¶ 95-96; Def. Ex. GG (Dkt. No. 69-33))  Included in this package was the 28-page Probation Report recommending that Perez be terminated and the October 9, 2009 letter from Perez confirming receipt of the Probation Report.  (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 97; Def. Ex. GG (Dkt. No. 69-33))  Neither of these documents was part of the package that Hunter had provided to Boughner in 2013.  (Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶¶ 10, 52; Def. Ex. JJ (Dkt. No. 63-36))

Cohen asked DCAS's Senior Director of Investigations Kevin Williams to investigate whether Perez's "No" answer to the question, "Have you every resigned from a job to avoid termination or disciplinary action?" constituted "fraud of a substantial nature."  (Def. R.

_____

[7] As noted above, under New York State Civil Service Law § 50(4), employees with civil service protections may be disqualified from their appointment "upon a finding of illegality, irregularity or fraud of a substantial nature in [their] application."  N.Y. Civ. Serv. § 50(4)(h) (see also Pltf. Opp. (Dkt. No. 73) at 11; Pltf. Counter R. 56.1 Stmt. (Dkt. No. 74) at 2 n.3)

56.1 Stmt. (Dkt. No. 70) ¶ 99; Pltf. Ex. 16 (Dkt. No. 62-18)) In a December 21, 2015 email to Williams, Cohen attached the 34 pages of Sanitation Department documents and stated that she believed the material showed that Perez had committed "fraud of a substantial nature" when he answered "No" to the aforementioned question. (Def. Ex. MM (Dkt. No. 69-39); see also Pltf. R. 56.1 Stmt. (Dkt. No. 62-37) ¶ 32)

Boughner was assigned to investigate the issue. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 100) During the investigation, Boughner concluded that – based on the Probation Report and Perez's October 9, 2009 letter acknowledging receipt of the report – Perez had resigned from the Sanitation Department in order to avoid termination. (Boughner Dep. (Dkt. No. 69-31) at 25, 29-30) DCAS did not have Perez's October 9, 2009 letter when it originally certified Perez in 2013. (Id. at 29; Def. Ex. JJ (Dkt. No. 63-36)) As a result of Boughner's investigation, DCAS also learned for the first time that Perez had been terminated by the Housing Authority but was permitted to resign as part of a settlement agreement. (Def. R. 56.1 Stmt. (Dkt. No. 74) ¶¶ 68, 104)

DCAS sought an explanation from Perez for the discrepancy between his "No" response to the question, "Have you ever resigned from a job to avoid termination or disciplinary action?" and the documents DCAS had recently received from the Housing Authority and the Sanitation Department. (Id. ¶¶ 9, 106, 117) Perez, through counsel, attempted to explain the discrepancies in letters dated March 2, 2016 and April 4, 2016, but DCAS did not find his explanations persuasive. (Id. ¶¶ 109-14, 118) DCAS concluded that Perez's settlement with the Housing Authority permitted him to resign in lieu of termination, and that Perez's October 9, 2009 letter demonstrated that Perez was aware that the Sanitation Department was about to terminate him at the time he submitted his resignation. (Id. ¶¶ 113, 116)

On April 26, 2016, DCAS issued a Notice of Personnel Action stating that Perez was not qualified for the Stationary Engineer position, given that he had obtained the position through "fraud" and by "falsif[ying] official NYC employment documents" and "omitt[ing] pertinent fact(s)." (Id. ¶ 119; Def. Ex. F (Dkt. No. 69-6)) In a May 2, 2016 letter, DCAS informed Perez that his employment was terminated effective April 29, 2016. (Def. R. 56.1 Stmt. (Dkt. No. 74) ¶ 11)

On May 16, 2016, Perez appealed his termination to the New York City Civil Service Commission. (Id. ¶ 122) In a September 21, 2016 decision, the Commission affirmed DCAS's disqualification of Perez based on fraud in the application process. The Commission concluded that Perez had omitted material facts on the Comprehensive Personnel Document when he answered "No" to the question, "Have you ever resigned from a job to avoid termination or disciplinary action?" (Id. 123) The Commission's decision states:

> [Perez's] settlement with [the Housing Authority] permitted him to resign instead of being terminated, but did not absolve him of the obligation to provide an affirmative response to the . . . question, "Have you ever resigned from a job to avoid termination or disciplinary action?" His failure to do so supports a disqualification . . . for intentionally making a false statement of a material fact.
>
> Further, the record is clear that there was no settlement in place with [the Sanitation Department] when he completed his [Comprehensive Personnel Document] form for the position of Stationary Engineer on December 12, 2012. There is no dispute that the October 8, 2009 [Sanitation Department] probation report recommended termination, that [Perez] received a copy of the report and had ample time to review it, and that [Perez] resigned on October 20, 2009, the same day that [the Sanitation Department's] Employee Review Board was to meet to consider the recommendation. [Perez] did not enter into a stipulation with [the Sanitation Department] until March 31, 2014, and his failure on December 12, 2012, to report his resignation in lieu of termination in 2009 further supports a disqualification . . . for intentionally making a false statement of a material fact.

(Ex. RR (Dkt. No. 69-44) at 5)

## II. PROCEDURAL HISTORY

The Complaint was filed on August 25, 2016, in Supreme Court of the State of New York, New York County. (Notice of Removal (Dkt. No. 1) ¶ 1) The Complaint asserts causes of action for (1) hostile work environment on the basis of disability, ethnicity, national origin, and sexual orientation in violation of the NYSHRL and the NYCHRL; (2) unlawful termination on the basis of disability, ethnicity, national origin, and sexual orientation in violation of the NYSHRL and the NYCHRL; (3) hostile work environment on the basis of disability in violation of the ADA; (4) retaliation in violation of the ADA; and (5) breach of contract based on Defendants' failure to award Perez certain pension credits. (Cmplt. (Dkt. No. 1-1) ¶¶ 44-63)

On September 9, 2016, Defendants removed the case to this District. (Notice of Removal (Dkt. No. 1)) On February 4, 2017, this Court granted Perez's request to sever and remand the contract claim to state court. (Order (Dkt. No. 13)) The parties then completed discovery on Perez's remaining claims. (Dkt. No. 51)

Defendants have moved for summary judgment on all of Perez's claims (Def. Br. (Dkt. No. 71)), and Perez has cross-moved for summary judgment on his ADA claims.[8] (Pltf. Br. (Dkt. No. 62-34))

---

[8] As noted earlier, Perez asks this Court to grant him summary judgment based on ADA claims not pled in the Complaint, including that Defendants discriminated against him by failing to offer him a reasonable accommodation, and terminating him because of his disability. (Pltf. Br. (Dkt. No. 62-34) at 14, 18) Because the ADA claims pled in the Complaint do not include claims for failure to provide a reasonable accommodation and discriminatory termination, Perez cannot raise these claims at summary judgment. See Byrd v. KTB Capital LLC, No. 6:16-CV-06017 (MAT), 2019 WL 652529, at *4 (W.D.N.Y. Feb. 15, 2019) (in case premised on violations of the Fair Housing Act ("FHA"), declining to consider new theories of liability under the FHA at summary judgment; "[i]t is clearly improper for a litigant to assert new claims for the first time at the summary judgment stage"); Bal, 2018 WL 6528766 (noting that it is "inappropriate to raise new claims for the first time in submissions at the summary judgment stage") (internal

## DISCUSSION

## I.   LEGAL STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring

---

quotation marks omitted); Sec. & Exch. Comm'n v. Yorkville Advisors, LLC, 305 F. Supp.3d 486, 531 (S.D.N.Y. 2018) (ruling that plaintiff "cannot now amend [its] complaint merely by raising new facts or theories in [its] briefs"); Kizer v. Abercrombie & Fitch Co., No. 12-CV-5387 (JS) (AKT), 2018 WL 6106853, at *2 (E.D.N.Y. Nov. 20, 2018) (a "party cannot amend their complaint simply by alleging new facts and theories in their [summary judgment] memoranda"); Toussaint v. NY Dialysis Servs., Inc., 230 F. Supp. 3d 198, 214 (S.D.N.Y. 2017), aff'd, 706 F. App'x 44 (2d Cir. 2017) ("'Allowing [plaintiff] to proceed on this new theory of liability would effectively amend the complaint at the summary judgment stage.'") (quoting Seeman v. Gracie Gardens Owners Corp., 794 F. Supp. 2d 476, 482 (S.D.N.Y. 2011));. Rao v. Rodriguez, No. 14 Civ. 1936 (NGG) (ST), 2017 WL 1214437, at *5 n.8 (E.D.N.Y. Mar. 31, 2017) (in discrimination action, declining to consider constructive discharge claim raised for the first time at summary judgment); Alexander v. City of New York, No. 11-CV-4638(NG)(MDG), 2014 WL 12829215, at *1, *9 n.12 (E.D.N.Y. Dec. 30, 2014) (in case alleging race and gender based discrimination and retaliation in violation of federal and state law, refusing to consider at summary judgment new claim that plaintiff was terminated because of her race).

Tailor, LLC, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting

Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

   In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting

Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation

omitted)).  However, a "'party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment. . . .  [M]ere conclusory

allegations or denials . . . cannot by themselves create a genuine issue of material fact where

none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in

original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

   "The same standard[s] appl[y] where, as here, the parties file[] cross-motions for

summary judgment. . . ."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

"[W]hen both parties move for summary judgment, asserting the absence of any genuine issues

of material fact, a court need not enter judgment for either party.  Rather, each party's motion

must be examined on its own merits, and in each case all reasonable inferences must be drawn

against the party whose motion is under consideration."  Id. (internal citations omitted).

   "In cases based on allegations of [discrimination and] discriminatory retaliation,

courts must use 'an extra measure of caution' in determining whether to grant summary

judgment[,] 'because direct evidence of discriminatory intent is rare and such intent often must

be inferred from circumstantial evidence.'"  Thompson v. Morris Heights Health Ctr., No. 09

Civ. 7239 (PAE) (THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting Schiano v.

Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)).

However, "'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination [and retaliation] cases than to . . . other areas of litigation.'" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). As in any other case, a plaintiff in a discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' [H]e must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." Brown, 257 F.3d at 252 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal citations omitted). "Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion. Gross v. Nat'l Broad. Co., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) ("'[E]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment' . . . [and] 'must offer some hard evidence showing that [his] version of the events is not wholly fanciful.'" (quoting Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008); Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005))).

## II.    ANALYSIS

### A.    ADA Hostile Work Environment Claim

#### 1.    Applicable Law

To establish a hostile work environment claim under the ADA, "'a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" Grewal v. Cuneo Gilbert & LaDuca LLP, No. 13 Civ. 6836 (RA), 2017 WL 1215752, at *11 (S.D.N.Y. Mar. 31, 2017) (quoting Littlejohn v. City of New

York, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))); see Fox v. Costco Wholesale Corp., 918 F.3d 65 (2d Cir. 2019) (holding that the disabled can "assert hostile work environment claims under the ADA"). "'[I]t is axiomatic,'" however, "'that the plaintiff must show that the hostile conduct occurred because of [his disability].'" Grewal, 2017 WL 1215752, at *11 (quoting Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015)).

## 2. **Application**

As an initial matter, Perez's hostile work environment claim cannot be premised on conduct that occurred before October 15, 2015. DCAS first learned of Perez's sleep apnea when he sought a reasonable accommodation on that date, and submitted a note from a physician's assistant stating that he suffered from that condition. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶ 20) Accordingly, the numerous disciplinary letters and memoranda that were issued to Perez between September 2014 and October 2015 for his poor work performance and job-related misconduct are not evidence of a hostile work environment.[9] See Williams v. New York City

---

[9] One performance-related memorandum is dated October 16, 2015 – a day after Perez's reasonable accommodation request – but there is no evidence that this memorandum was ever shown to Perez. (Def. Ex. M (Dtk. No. 69-13) at 38-40) This letter therefore cannot support a hostile work environment claim. See Davis v. New York Dep't of Corr., 256 F. Supp. 3d 343, 354 n.7 (S.D.N.Y. 2017) ("harassment of which plaintiff was unaware cannot support hostile work environment") (citing Cestone v. Gen. Cigar Holdings, Inc., No. 00-CV-3686 (RCC) (DF), 2002 WL 424654, at *3 (S.D.N.Y. Mar. 18, 2002)). Moreover, given the countless disciplinary memoranda and letters issued to Perez before he disclosed his sleep apnea condition, there is no reason to believe that the October 16, 2015 memorandum was prepared because of Perez's disability. See Wilkinson v. Nord Anglia Educ. Ltd., No. 17 CIV. 7421 (PAE), 2019 WL 3430662, at *10 (S.D.N.Y. July 30, 2019) ("'[B]ecause the record is replete with undisputed evidence that Defendant imposed progressive discipline against [plaintiff] well before September, an inference of discrimination will not arise based solely on the proximity between her complaint and termination.'") (quoting Tomasino v. St. John's Univ., 476 F. App'x. 923, 925 (2d Cir. 2012)); Lee v. Colvin, No. 15 Civ. 1472, 2017 WL 486944, at *15 (S.D.N.Y. Feb. 6, 2017) ("Plaintiff's hostile work environment claim . . . fail[s] because he has not shown any

Dep't of Educ., No. 18-CV-11621 (RA), 2020 WL 906386, at *6 (S.D.N.Y. Feb. 25, 2020) ("'It is, of course, elemental that an employer could not have discriminated against a plaintiff because of her disability if it was unaware that the plaintiff was, in fact, disabled.'") (quoting Cozzi v. Great Neck Union Free Sch. Dist., No. 05-CV-1389, 2009 WL 2602462, at *14 (E.D.N.Y. Aug. 21, 2009)) (emphasis omitted).

Moreover, none of the alleged post-October 2015 disability-related conduct is sufficiently severe to constitute a hostile work environment. Perez asserts that DCAS assigned someone with "a conflict of interest" – an apparent reference to French – to investigate his reasonable accommodation request. (Pltf. Opp. (Dkt. No. 73) at 20) Although French – who was investigating an EEO complaint filed against Perez – was briefly responsible for Perez's reasonable accommodation request, Barrett quickly took over responsibility for Perez's request. (Def. R. 56.1 Stmt. (Dkt. No. 70) ¶¶ 39, 42-43) And while Perez complains about the delay in processing his reasonable accommodation request, his shift and worksite were not changed during the pendency of his request. In sum, nothing in the handling of Perez's reasonable accommodation request supports his hostile work environment claim.[10] See Dechberry v. New York City Fire Dep't, 124 F. Supp. 3d 131, 147 (E.D.N.Y. 2015) ("Courts in this circuit have found that a delay in the administrative processing of benefits [and paperwork] does not

---

'linkage or correlation' between the conduct, on the one hand, and a protected characteristic, on the other.").

[10] As noted above, Perez contends – without evidentiary support – that his shift was changed for two days in early December. (See supra n.6) Even assuming the truth of this unsupported allegation, it would not support a hostile work environment claim. See Guerrero Toro v. NorthStar Demolition & Remediation, 366 F. Supp. 3d 449, 467 (W.D.N.Y. 2019) ("Work reassignments and rescheduling 'do not rise to the level of an actionable hostile work environment claim.'") (quoting De la Cruz v. City of New York, 783 F.Supp.2d 622, 644 (S.D.N.Y. 2011)); Smalls v. Allstate Ins. Co., 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[R]eceiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions. . . .").

generally constitute an adverse employment action.") (collecting cases); Williams v. New York City Hous. Auth., No. 03-CV-7764, 2008 WL 2695139, at *3 (S.D.N.Y. June 29, 2008), aff'd, 361 F. App'x 220 (2d Cir. 2010) ("A delay in processing paperwork that does not materially change the terms and conditions of a plaintiff's employment is not an adverse employment action.").

The Court concludes that Perez has not proffered evidence sufficient to create a genuine issue of material fact with respect to his ADA hostile work environment claim. Accordingly, Defendants will be granted summary judgment on that claim.

**B.** **ADA Retaliation Claim**

**1.** **Applicable Law**

Retaliation claims under the ADA are "analyzed under the three-step burden-shifting scheme articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Nieblas-Love, 165 F. Supp. 3d at 65-66, 74-75. "First, the plaintiff must establish a prima facie case of retaliation by showing: '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Hicks, 593 F.3d at 164 (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)). "A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" Littlejohn, 795 F.3d at 319 (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

Plaintiff's burden in establishing a prima facie case of retaliation is "'de minimis,'" and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" Hicks, 593 F.3d at 164 (quoting Jute, 420 F.3d at 173). "If the plaintiff sustains this initial burden, 'a presumption of retaliation arises.'" Id. (quoting Jute, 420 F.3d at 173).

At the second step of the McDonnell Douglas analysis, the burden shifts to the defendant to rebut the presumption of retaliation "by 'articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action.'" Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 70 (2d Cir. 2015). "If the defendant provides such an explanation, 'the presumption of retaliation dissipates.'" Id. (quoting Jute, 420 F.3d at 173).

At the third and final step of the analysis, "[t]he plaintiff must . . . come forward with [proof that the] non-retaliatory reason is a mere pretext for retaliation." Misas v. N. Shore-Long Island Jewish Health Sys., No. 14 Civ. 08787 (ALC) (DCF), 2017 WL 1535112, at *9 (S.D.N.Y. Apr. 27, 2017) (citation and internal quotation marks omitted). To satisfy this burden, "the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action,'" Ya-Chen Chen, 805 F.3d at 70 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013)), and "not simply a 'substantial' or 'motivating' factor in the employer's decision." See Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013) (citing Nassar, 133 S. Ct. at 2526, 2533). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Id. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating

weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Id. (citations omitted). At the same time, "'[a] reason cannot be proved to be a pretext . . . unless it is shown both that the reason was false, and that discrimination [or retaliation] was the real reason.'" Galimore v. City Univ. of New York Bronx Cmty. Coll., 641 F. Supp. 2d 269, 288–89 (S.D.N.Y. 2009) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)) (alterations in Galimore).

### 2. Application

Defendants concede (see Def. Br. (Dkt. No. 71) at 26), and the Court finds, that Perez has established the first three elements of a prima facie case: the October 15, 2015 reasonable accommodation request constitutes a protected activity; Defendants knew about that protected activity; and Perez's termination constitutes an adverse employment action.

As to the fourth element, Perez contends that he was terminated in retaliation for making his October 15, 2015 reasonable accommodation request. (Pltf. Br. (Dkt. No. 62-34) at 36-37; Pltf. Opp. (Dkt. No. 72) at 7, 10) No reasonable jury could make that finding.

Between September 2014 and October 15, 2015 – when Perez filed his reasonable accommodation request – multiple DCAS managers at different DCAS locations issued countless disciplinary memoranda and letters to Perez documenting his utter incompetence and work misconduct. (Def. Ex. M (Dkt. No. 69-13)) Indeed, according to Perez, DCAS was – as early of June 2015 – creating a paper record that would justify his termination. (Perez Aff. (Dkt. No. 72) ¶¶ 54-58) Consistent with Perez's understanding, in a June 9, 2015 email, Director of Discipline Hicks asked Director of Mechanical Operations O'Donnell to confirm that Perez had

received all disciplinary memoranda and letters up to that point, stating that "[t]hey will not count as prior disciplinary action unless we can prove he received them." (Perez Aff. (Dkt. No. 72) at 96)

On October 7, 2015, Perez was directed to appear at the Office of Disciplinary Proceedings in Manhattan on October 20, 2015. (Def. Ex. M (Dkt. No. 69-13) at 33) As discussed above, disciplinary charges against Perez were ultimately not pursued, because DCAS managers learned that Perez could be "disqualified" as a result of his lie on the Comprehensive Personnel Document that he completed when he applied for his DCAS position. (Hicks Dep. (Dkt. No. 62-33) at 11)

Because Perez was subject to extensive, progressive counseling and discipline before he filed his reasonable accommodation request on October 15, 2015, he cannot show that his request for a reasonable accommodation and his termination are causally linked. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (no causation where "progressive discipline" began prior to plaintiff's filing of EEOC charge); Wilkinson, 2019 WL 3430662, at *10 ("It is well established that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity."); Betterson v. HSBC Bank, USA, N.A., 139 F. Supp. 3d 572, 594 (W.D.N.Y. 2015), aff'd, 661 F. App'x 87 (2d Cir. 2016) ("As the Second Circuit has made clear, when an adverse employment action is 'part of an extensive period of progressive discipline,' and "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'") (quoting Chinnery v. N.Y.S. Office of Children & Family Servs., No. 10 Civ. 882, 2014 WL 1651950, at *12 (S.D.N.Y. Apr. 25, 2014) (citing Slattery, 248 F.3d at 95)).

Because Perez has failed to establish a prima facie case, Defendants are entitled to summary judgment on his retaliation claim. See Williams v. Saint-Gobain Corp., No. 00-CV-0502E(SC), 2001 WL 392035, at *2 (W.D.N.Y. Apr. 12, 2001) ("[L]ack of causation is fatal to establishing a prima facie case of retaliation and, insofar as there can be no genuine issue as to any material fact with regard to such issue, these claims will be dismissed.").

## III. WHETHER SUPPLEMENTAL JURISDICTION SHOULD BE EXERCISED OVER PLAINTIFF'S NON-FEDERAL CLAIMS

Federal district courts have supplemental jurisdiction over state and city law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, "such jurisdiction is discretionary," Vuona v. Merrill Lynch & Co., 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (citing City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)), and "a district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" Id. (quoting 28 U.S.C. § 1367(c)(3)). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.'" Sefovic v. Mem'l Sloan Kettering Cancer Ctr., No. 15 Civ. 5792 (PAC), 2017 WL 3668845, at *8 (S.D.N.Y. Aug. 23, 2017) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)) (alterations omitted).

Federal courts often decline to exercise supplemental jurisdiction over NYSHRL and NYCHRL discrimination claims where, as here, a motion for summary judgment is granted as to all federal claims. See, e.g., Booker v. Soho Studio Corp., No. 17CV5426 (PKC) (SMG), 2020 WL 363912, at *8 (E.D.N.Y. Jan. 22, 2020) ("[I]n light of the Court's dismissal of all of

Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and NYCHRL claims, which are dismissed without prejudice to renew in state court."); Rogers v. Fashion Inst. of Tech., No. 14-CV-6420 (AJN), 2019 WL 4749850, at *1 (S.D.N.Y. Sept. 30, 2019) ("Defendants move for summary judgment and . . . the Court GRANTS Defendants' motion as to all federal claims, and DECLINES to exercise supplemental jurisdiction over the remaining NYSHRL and NYCHRL claims.") (emphasis in original); Triana v. Sodexo, Inc., No. 15 Civ. 5895 (RA), 2018 WL 6413151, at *8 (S.D.N.Y. Dec. 5, 2018) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment on federal claims).

Here, "because discovery is complete and because the parties have already briefed the NYCHRL" and NYSHRL claims, "the parties are 'equipped to present those claims to a state court expeditiously'" on remand. Fletcher v. ABM Bldg. Value, No. 14 CIV. 4712 (NRB), 2018 WL 1801310, at *24 (S.D.N.Y. Mar. 28, 2018), aff'd, 775 F. App'x 8 (2d Cir. 2019) (quoting 28 Martin v. Sprint United Mgmt. Co., No. 15 Civ. 5237 (PAE), 2017 WL 5028621, at *4 (S.D.N.Y. Oct. 31, 2017)). Accordingly, the Court declines to exercise supplemental jurisdiction over Perez's NYSHRL and NYCHRL claims and remands the case to the state court from which it was removed.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Dkt. No. 68) is granted as to Plaintiff's claims under the Americans with Disabilities Act, and Plaintiff's cross-motion for summary judgment on these claims (Dkt. No. 62) is denied. The Clerk of Court is directed to close this case and return the matter to the Clerk of the Supreme Court of the State of New York, New York County.

Dated: New York, New York
  March 16, 2020

      SO ORDERED.

      _Paul G. Gardephe_
      Paul G. Gardephe
      United States District Judge